USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _3/28/2024_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**MOSES,** *et al.***,** *individually and on behalf of all*
*others similarly situated,*

                      **Plaintiffs,**

        **-against-**

**CONSOLIDATED EDISON COMPANY OF**
**NEW YORK INC.,** *et al.***,**

                   **Defendants.**

---

**18-CV-01200 (ALC)**

**<u>OPINION AND ORDER</u>**

**ANDREW L. CARTER, JR., United States District Judge:**

Named Plaintiffs Raven Moses, Staraisha Morris, Dwayne Dale, Ismaiyl Jones, Ayanna

Beacham, Andre Murray, Victor Ballast, and Luis Simone Insurance ("Plaintiffs") bring this

action against Defendants Consolidated Edison Company of New York, Inc., Griffin Industries,

LLC, Griffin Security Servicon Eds, Michael Smith, Winston Smith, Andrew Muniz, and Aaron

Muniz ("Defendants") for, among other claims, recovery of unpaid minimum wage, overtime,

spread-of-hours, and withheld wages, unreimbursed business expenses, and for wage statement

and notice violations under the FLSA, 29 U.S.C. §§ 201 *et seq.*, and New York labor law as well

as for breach of contract.  ECF No. 160 ("Cons. Am. Compl.").  The Court considers herein

Defendant Con Edison's motion for summary judgment as to the first ten counts of Plaintiffs'

Consolidated Amended Complaint as well as Defendants' motion to strike portions of Plaintiff's

Rule 56.1 Counterstatement and supporting declaration.  *See* ECF Nos. 686, 721.  For the

reasons stated below, Defendants' motion to strike is **DENIED** and motion for summary

judgment is **GRANTED**.

## BACKGROUND

Defendant Consolidated Edison ("Con Ed") is a utility company that provides "electric, gas and steam services in New York City and Westchester County." ECF No. 695 ("Pls' Counterstatement") at ¶ 1. Co-defendants Griffin Industries, LLC and Griffin Security Services, Inc. ("Griffin") are companies which provided flaggers to Con Ed for its worksites pursuant to a Blanket Purchase Agreement ("BPA") executed between the two companies. *Id.* at ¶ 4. Defendant. Plaintiffs are "a group of former Griffin employees who worked as flaggers at ConEd worksites." *Moses v. Consol. Edison Co. of N.Y., Inc.*, No. 18-cv-1200 (ALC), 2023 U.S. Dist. LEXIS 57096, at *8 (S.D.N.Y. Mar. 31, 2023).

Con Ed and Griffin enacted the BPA on September 1, 2015. Pls' Counterstatement at ¶ 11. Under the terms of the BPA, Griffin agreed to provide flagging services for Con Ed's Westchester County Gas and Electric Operations and provide "back-up services for other Con Edison Territories when deemed necessary." *Id.* at ¶ 13. The BPA contained a provision outlining the "Relationship of [the] Parties" which stated that:

> The Contractor shall be an independent contractor in the performance of the services hereunder. No right of supervision, requirement of approval or other provision of the Contract and no conduct of the parties shall be construed to create a relationship of principal and agent, partners, or joint venturers between the parties, or joint employers of the Contractor's employees.

*Id.* at ¶ 15. The BPA also contained provisions requiring Griffin to "comply with all federal, state, and local laws" including "the Fair Labor Standards Act," and to "pay all contributions or taxes imposed by or required under the unemployment laws." *Id.* at ¶ 16-17. The BPA also expressly disclaims the existence of any other third-party beneficiaries of the [c]ontract." *Id.* at ¶ 18. The BPA did not contain an exclusivity provision for either Con Ed or Griffin, meaning that either was free to provide or procure flagging services to or from others. *Id.* at 20. Griffin provided security services to at least two other entities during the relevant time period but only provided flagging services to

Con Ed.  *Id.* at ¶ 20-21.  Meanwhile, Con Ed procured flagging work from other vendors in that time.  *Id.* at ¶ 20-21.

The BPA was amended in 2018 to provide traffic flagging services on Staten Island on a requested basis.  *Id.* at 14.  In practice, Griffin flaggers were dispatched to job sites throughout New York City, including to Manhattan, Westchester, Staten Island, and The Bronx.  *Id.* at ¶ 13. Additionally, while Griffin's ability to provide back-up flagging services was curtailed in 2017 after Con Ed contracted with another vendor to provide such services, Griffin provided flagging services to Con Ed as late as May 2018.  *Id.* at ¶ 14.

Plaintiff flaggers were utilized where, pursuant to state and federal regulations, Con Ed was required to implement traffic control safety measures when working on their utilities infrastructure adjacent to roadways.  *Id.* at ¶ 24.  When flaggers were needed for qualifying road-adjacent repair or maintenance work, Con Ed would submit electronic requests for flaggers to Griffin's offices.  *Id.* at ¶ 29.  These electronic requests would include information on the project, job details, and a date and time that flaggers would be needed.  *Id.* at ¶ 31.  In addition to these electronic requests, supervisors of Con Ed work sites would also reach out independently to specific flaggers to ask them to work on their sites or would dispatch a Griffin crew that had completed one job to a subsequent work site.  *Id.* at 29.  While the flagging services were performed on public roadways and not on Con Ed property, Plaintiffs were sent to Con Ed yards to await job assignments and their work was overseen by Con Ed personnel as Griffin management personnel were often traveling between job sites to sporadically observe flaggers as travel time and traffic constraints permitted.  *Id.* at ¶ 27, 92.

Con Ed paid Griffin for flagging services by the hour at regular, overtime, and Holiday rates that varied depending on the dates, times and locations where the work was performed.  *Id.*

at ¶ 35.  The operative rates were all above the requisite state minimum wage.  *Id.*  The BPA rates were inclusive of "profit and all indirect costs, including, but not limited to, field overhead, home office costs, engineering and all other off-site costs" as well as "supervision, uniforms, training, profit, taxes and insurance."  *Id.* at ¶ 36.  Griffin was required to invoice Con Ed for all flagging services performed and provide documentation to Con Ed supporting their billed hours.  *Id.* at ¶¶ 37-38.  To that end, Griffin required Plaintiffs to fill out and provide to Griffin Sign Off sheets which confirmed the number of hours flaggers worked.  *Id.* at ¶ 42.  Upon the submission of these sheets to Con Ed, the BPA required a Con Ed site supervisor or representative to sign off on the actual time worked for Griffin to be paid.  *Id.* at 38.  Con Ed was contractually obligated to pay Griffin's invoices within ten days of invoice.  *Id.* at ¶¶ 48-49.  While Con Ed paid Griffin directly for services rendered, Griffin used the records of flaggers' hours to pay Plaintiffs at a rate Griffin themselves set.  *Id.* at ¶¶ 45-47, 50.  Griffin's collective bargaining agreement with Local 1430, International Brotherhood of Electrical Workers, who represented the flaggers, purported to set some terms and conditions of the flaggers' employment.  *Id.* at ¶¶ 103, 105.

Griffin oversaw recruiting, hiring, and onboarding of flaggers and provided flaggers' paychecks and benefits without Con Ed's participation.  *Id.* at ¶¶ 57, 65-68, 71, 108-109; *see also id.* at ¶¶ 60-64 (establishing that flaggers submitted their applications and personnel files to Griffin and were interviewed by non-Con Ed personnel); ECF No. 694 ("Opp.") at 10 ("Griffin . . . perform[ed] administrative functions like payroll, dispatch, and hiring.").  Griffin also provided compensated training to flaggers during which they disseminated policy documentation, some of which mirrored the BPA's safety specifications, and put hires through a three-phase flagging certification course.  Pls' Counterstatement at ¶¶ 69-70, 72, 81-84.  Con Ed personnel also informed flaggers of their responsibilities and the specific conditions of a work

site. *Id.* at ¶ 77. While Griffin applied their own progressive discipline, drug testing, and sexual harassment policies, Con Ed could and did raise complaints about specific flaggers to Griffin under the BPA. *Id.* at ¶¶ 72, 110-140. Additionally, while Griffin provided much of the equipment flaggers needed to do their jobs such as hard hats, traffic vests, flashlights/wands, and uniforms, Con Ed also provided traffic cones and, at times, provided equipment to flaggers on worksites. *Id.* at ¶¶ 87, 89-90; *see also id.* at ¶¶ 88, 94-95, 100 (noting that Griffin exclusively provided flaggers with radios and maintained a fleet of company vehicles flaggers could sign out for work).

Griffin ceased providing flagging services to Con Ed in June 30, 2018. *Id.* at ¶ 53.[1] Plaintiffs were terminated from Griffin after the loss of the Con Ed BPA because, as Plaintiffs argue, Griffin had no other flagging clients to which it could send workers. *Id.* at ¶ 55. Con Ed then undertook a bidding process and entered a flagging contract with a third-party vendor. *Id.* at ¶ 54.

## STANDARD OF REVIEW

### I.  Summary Judgment

Summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see*

---

[1] The Court notes Plaintiffs' allegations that "some form of Griffin successor and/or related entity was . . . in operation subsequent to December of 2018." Pls' Counterstatement at ¶ 53. The Court excludes these allegations from the factual background only because they are not relevant to the disposition of the present motion and makes no further statement as to the merits of the allegation.

*also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252). At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

## II.   Strike

Rule 56(C)(4) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Local Civil Rule 56.1 requires a party seeking summary judgment include a statement of materials facts as to which the moving party contends there is no genuine issue to be tried. In that statement, the moving party must include a "citation to evidence which would be admissible, set forth, set forth as required by the Federal Rule of Civil Procedure 56(e)." L.R. 56.1(d). Therefore, "only admissible evidence" is considered as "[t]he principles governing admissibility

of evidence do not change on a motion for summary judgment."  *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

## DISCUSSION

### I.    Strike

Defendants move this Court to strike portions of Plaintiffs' 56.1 Counterstatement and two supporting declarations submitted therewith.  *See* ECF No. 721 ("Def. Mot.").  Defendants ask this Court to strike the following as irrelevant, inadmissible hearsay, improper conclusion and opinion testimony, and improper legal argumentation: (1) those statements in Plaintiff Ballast's declaration that "many of the Griffin flaggers who did not immediately start working for CE Solutions after Griffin lost its contract with Con Edison went to flag for Workforce7," (2) those statements in Plaintiff Ballast's declaration that approximately 75% of Griffin flaggers went to work directly for CE Solutions after Griffin lost its contract with Con Ed, (3) citations to Plaintiff Dale's deposition testimony that he was told by unidentified Griffin employees that he would not be paid until Con Ed paid him for his hours worked, (4) Plaintiffs' references in their 56.1 Counterstatement to the alleged statements of Con Ed supervisors regarding flaggers' work, project assignments, and pay rates, Defendants also ask this Court to strike, and (5) a broad swath of Plaintiff's 56.1 Counterstatement responses which Defendants allege contain improper legal argument.  *See* Def. Mot. at 2-10.

In response, Plaintiffs argue, *inter alia*, that Plaintiff Dale and Ballast's deposition and declaration statements are relevant and admissible and that their Counterstatement responses do not contain improper legal argument.  *See* ECF No. 723.

"Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute."  *Kehr ex rel. Kehr v. Yamaha Motor*

*Corp., U.S.A.*, 596 F. Supp. 2d 821, 829 (S.D.N.Y. 2008) (internal quotation marks omitted). This is a "heavy burden." *Christians of Cal., Inc. v. Clive Christian N.Y., LLP*, No. 13-CV-275 (KBF), 2014 U.S. Dist. LEXIS 95531, at *5 (S.D.N.Y. July 7, 2014) (internal citation omitted). "A motion to strike is particularly disfavored in the Rule 56.1 context." *Pearlstein v. BlackBerry Ltd.*, 2022 U.S. Dist. LEXIS 1537, at *23 (S.D.N.Y. Jan. 3, 2022). "Where a court does not rely on contested submissions in deciding a motion for summary judgment, it may deny a party's motion to strike as academic." *Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2020 U.S. Dist. LEXIS 142735, at *43 (S.D.N.Y. Aug. 10, 2020)

Because the Court does not rely on the statements and representations Defendants seek to strike, Defendants' motion to strike is rendered academic.

## II.    Formal Control

Defendants move for summary judgment as to those first ten counts of Plaintiffs' Consolidated Amended Complaint which are "premised on the notion that Con Edison jointly employed them." ECF No. 686 ("Mot.") at 1. Defendants argue that there is no issue of material fact as to whether Con Ed jointly employed Plaintiffs alongside Griffin as the former never had formal or functional control over Plaintiffs. *See generally id.*

To establish joint employment under the formal control test, the alleged joint employer must have: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty, Coll.*, 735 F.2d 8, 12 (1984).

### A. Power to Hire/Fire

On the first element, Defendant argues that they played no part in the hiring and firing of Plaintiffs and that Griffin was solely responsible for those tasks. Mem. at 12-14. Plaintiffs present no evidence supporting a finding that Con Ed was involved in the hiring of flaggers. Rather, Plaintiffs argue that applicants subjectively believed "that they would be working as Con Ed Flaggers" based upon recruitment materials they received from a community hiring organization. Pls' Counterstatement ¶¶ 60-63, 190. These allegations, even credited as true, as is necessary for the present motion, are insufficient to establish that Con Ed had any power to hire the flaggers. What's more, the undisputed factual record establishes that Griffin oversaw flaggers' recruitment, hiring, and onboarding independently of Griffin. *See id.* at ¶¶ 65-68 (establishing, without dispute, that Con Ed "did not participate in Griffin's decisions regarding the screening or hiring of its . . . flaggers, nor did Con Ed participate in the interviews of Plaintiffs or Griffin's other job candidates," "did not solicit, receive, or accept applications for Griffin job positions," "interview applicants for Griffin job positions or arrange for candidates to be interviewed by Griffin managers," and that "Plaintiffs completed Griffin's new-hire paperwork" as part of their onboarding process).

There is somewhat more substantive argument as to whether Con Ed had the power to fire Plaintiffs. On this, Defendants concede that Con Ed "had the power under the . . . BPA to request that Griffin remove a traffic control flagger from its project worksites." Mot. at 13. Defendants couch this authority as being a commonplace deauthorization power present in contracting relationships such as the one between Con Ed and Griffin rather than being a power to fire. *Id.* Such deauthorization powers have generally been understood to not qualify as the power to fire where the alleged joint employer does not have or exercise power to bar an

employee from "continu[ing] working for [a contractor] in some other capacity . . . or leave [that contractor] and later perform [work] while working . . . for another company." *Jean-Louis v. Metro. Cable Communs., Inc.*, 838 F. Supp. 2d 111, 124 (S.D.N.Y. 2011).  Such deauthorization authority does not necessarily amount to a power to fire even where the alleged joint employer is the sole source of revenue for a contractor where "there is no evidence in the record that [the contractor] terminated any employee about which [the alleged joint employer] specifically complained," *id.*, or "recommended to [the contractor] that a specific [worker] be disciplined." *Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013); *see also Godlewska v. HDA*, 916 F. Supp. 2d 246, 258 (E.D.N.Y. 2013), *aff'd sub nom. Godlewska v. Human Dev. Ass 'n, Inc.*, 561 F. App'x 108 (2d Cir. 2014) (finding a defendant's ability to de-authorize works was not a power to fire where the defendant "never recommended . . . that a specific [worker] be disciplined" or "exercised power to require [the contractor] to fire a [worker] entirely").

Defendants argue that Con Ed did not have the authority to terminate any flagger's employment with Griffin altogether and that a flagger Con Ed requested be removed from a worksite could still perform work for Griffin in other capacities.  In opposition, Plaintiffs allege that flaggers who were removed from work sites experienced *de facto* firing by Con Ed because "Griffin supervisors would fire specific flaggers" whom Con Ed complained about.  Opp. at 15. As evidentiary support for this assertion, Plaintiffs rely upon: (1) documents recording several instances in which flaggers were terminated after Con Ed complained to Griffin of that specific flaggers' unprofessional behavior, (2) a statement in Griffin's "Flagger's Manual" stating that flaggers would be "immediately suspen[ded] and possibly terminat[ed]" wherever "a member of the Griffin staff / Con Edison is given a hard time," and (3) testimony from one of Griffin's witnesses who stated that flaggers who received complaints did not have "any other place" in the

company "[u]nless they had a security guard license and they can work as a security guard and [Griffin]" had security posts available.  Pls' Counterstatement at ¶¶ 110, 135.

The disciplinary documentation which Plaintiffs cite to recount instances in which Con Ed personnel "spoke[] to Griffin and asked them not to send [specific] individuals . . . to any more of [Con Ed's] jobs," stated that certain flaggers were "no longer allowed to work for Con Ed" or "on Con Edison propery," or where flaggers were terminated "[p]ursuant to the notification made to [Griffin] by Con Ed" or "communications between dispatch and the [Con Ed] field rep."  *Id.* at ¶ 138.  Out of the trove of Con Ed's feedback to Griffin regarding specific flaggers which Plaintiffs cite to, they reference only a single instance in which the utilities company "recommend[ed] that [a] flagger be terminated" where that flagger "threw a . . . bag filled with urine on [a] customer's lawn."  *Id.*

While Plaintiffs present no evidence establishing Con Ed out and out directed Griffin to terminate specific flaggers, the singular instance where Con Ed personnel recommended the termination of a flagger does qualify at least as some evidence of a power to fire.  This element therefore slightly favors Plaintiffs.

## B.  Work Schedules/Conditions of Employment

"Simply determining when a certain job will be performed is not tantamount to determining which employee will perform that job at a particular time."  *Godlewska*, 916 F. Supp. 2d at 259.  A contractor's stipulation of "time windows" in which a contractor's workers are to work, without more, are insufficient to establish a defendant's control over workers' schedules.  *Jean-Louis*, 838 F. Supp. 2d at 126.  While "a defendant's extensive supervision of a plaintiff's work is indicative of an employment relationship . . . supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment

inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." *Ling Nan Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 74-75 (2d Cir. 2003). Therefore, Courts will distinguish "between circumstances where the putative joint employer maintains specific standards to which its and the contractors' and the contractors' employees must adhere, and regularly monitors the contractor's employees to ensure that their performance satisfies the putative joint employer's expectations." *Gil v. Pizzarotti, LLC*, No. 1:19-cv-03497-MKV, 2021 U.S. Dist. LEXIS 59668, at *30 (S.D.N.Y. Mar. 29, 2021) (citing *Vasto v. Credico (USA) LLC*, 2017 U.S. Dist. LEXIS 178457, at *30 (S.D.N.Y. Oct. 27, 2017)).

The undisputed factual record here is that flaggers reported to Griffin offices in the morning to await daily assignments which were handed out on a first come first served basis and at the end of each day to return their sign off sheets and equipment. Pls' Counterstatement ¶¶ 89, 146. Plaintiffs were also required to wait at times at a Con Ed work yard to be dispatched to a worksite by Con Ed personnel, were required to sit through Defendants' legally mandated safety briefings, follow Con Ed crews from site to site, and wait until receiving word from a Con Ed supervisor to conclude their work. *Id.* at ¶¶ 30, 142. Con Ed had and at times exercised the authority under the BPA, subject to Griffin's approval and availability, to request specific flaggers for their worksites. *Id.* at ¶ 147. Con Ed field supervisors sometimes required that Plaintiffs alter, move, or extend their flagging work area to mitigate traffic safety risks. Mot. at 10. Defendant Griffin also had limited on-site supervisory resources as the four field supervisors traveled between the several worksites to sporadically inspect flaggers work. Pls' Counterstatement ¶ 92.

The Court draws an inference in Plaintiffs' favor that Con Ed dictated flaggers' work schedules. While Con Ed's intermittent directives to flaggers regarding the precise location or

sizing of their flagging set up are nothing more than the permissible standard-setting as discussed in *Gil*, evidence that "flaggers would be dispatched to Con Ed yards for standby," were often directed by Con Ed supervisors to travel from worksite to worksite without Griffin supervisors' input or direction, and other such evidence crosses over into the manner of control contemplated under the case law.  Opp. at 16.

### C.   Rate/Method of Payment

While there is no evidence in the record and Plaintiffs do not seem to argue that Con Ed exercised any control over flaggers' method of payment, the Parties are at odds as to whether Con Ed's determined flaggers' rate of payment.  The operative facts are as follows.  The BPA set out a per-flagger hourly rate at which Con Ed paid Griffin for services rendered.  Pls' Counterstatement at ¶ 35.  The rates Con Ed paid Griffin under the BPA ranged between 80% and 419% higher than the rates which Griffin in turn paid their flaggers.  ECF No. 715 ("Reply") at 8.  Flaggers memorialized their time in and out of Con Ed worksites on Site Location Sign Off Sheet forms.  Pls' Counterstatement ¶ 41.  These forms were produced in triplicate, with one copy going to each of the flagger, Con Ed, and Griffin.  *Id.*  The forms contained a line for Con Ed supervisors to sign off flaggers' hours.  *Id.* at ¶ 42.  Some, but not all, of the forms were signed off on by Con Ed supervisors, and such signatures were not necessary for Griffin to invoice Con Ed for flaggers' work.  *Id.* at ¶ 43.  Flaggers returned their completed forms to Griffin offices at the end of each day.  *Id.* at ¶ 42.  Griffin provided one copy of the completed Sign Off sheets to Con Ed as supporting documentation for their invoices and retained the other for payroll preparation.  *Id.* at ¶ 45.  Con Ed maintained copies of the Sign Off sheets solely for purposes of auditing Griffin's invoices and to ensure that those invoices were accurate and reflected the hours flaggers actually worked.  *Id.* at ¶ 182.  When payroll issues arose, flaggers

complained to Griffin who would then relay those complaints as to flaggers' invoiced time to Con Ed. *Id.* at ¶ 36 (citing to Plaintiff Jones' deposition testimony at ECF No. 696-6 at 9-10). Con Ed then determined whether the alleged hours discrepancy was legitimate and would pay Griffin the difference per the BPA's rates. *Id.* Griffin would only pay the complaining flagger if Con Ed agreed that a flagger had worked the hours they reported. *Id.* Griffin often had insufficient funds to pay flaggers at least in part because of the time it took Con Ed to approve flaggers' hours and issue payment to Griffin. Opp. at 21.

"[A] putative joint employer who pays a contractor based on the number of hours the contractor's employees work has an effect on the amount that the contractor will pay those employees per hour." *Jean-Louis*, 838 F. Supp. 2d at 129 (citing *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 145 (2d Cir. 2008). Nevertheless, simply having an effect on workers' hourly rates is not sufficient to satisfy this factor. Rather, where workers are not paid directly by the alleged joint employer, this *Carter* factor is met where a putative joint employer's "calculations would have conclusively determined the number of hours for which [the workers] would be paid and the hourly rate that [the putative joint employer] paid [the contractor] would have effectively set a cap on the hourly rate." *Id.* (citing *Barfield*, 537 F.3d at 145) (internal quotation marks omitted).

Plaintiffs argue that "[i]n setting the unit prices per flagger hour and requiring approval of all hours worked, Con Ed exerted effective control over the hourly rates paid to the Plaintiffs and were well aware of the rates [flaggers] were paid." Opp at 21. Plaintiffs allege that Con Ed "calculated" flaggers' hours, paid Griffin for those hours, then Griffin "used those calculations to pay" the flaggers. *Jean Louis*, 838 F. Supp. 2d at 129 (casting aspersions on the validity of such a contracting relationship). "[T]here is no question that [an alleged joint employer] maintained .

. . [worker's] hours," *Barfield*, 537 F.3d at 144, where that defendant "signs off on" time sheets, "verif[ies] the number of hours worked by each" plaintiff and "then provides records of the hours worked" to the contractor employer. *Id.* at 136.

There is no evidence in the record to support Plaintiffs' view that Con Ed "calculated" flaggers' hours or pay. It is undisputed that Griffin utilized flaggers Sign-Off sheets to determine their hours worked and then made further payroll calculations and adjustments based upon whether flaggers performed other mandated tasks or were given travel time adjustments. *See* Pls' Counterstatement at ¶¶ 108(c) (noting, without dispute from Plaintiffs, that "Griffin's accountant[] tabulated Plaintiffs' and Griffins' other . . . flaggers' compensable hours based off the . . . Sign Off Sheets . . . as adjusted by Griffin's internal travel cost and time policies and any Griffin required training time); *see also id.* at ¶ 185. It is also undisputed that Con Ed supervisors did not always sign flaggers' Sign-Off Sheets and that such signatures were not required for Griffin to invoice their time. Also, unlike the facts in *Barfield*, Con Ed never provided flaggers' hours to Griffin. In fact, the exact opposite was true as Griffin provided duplicate records of flaggers' Sign-Off sheets to corroborate their invoices. That Griffin derived most of its revenue from its contract with Con Ed does not lend support to Plaintiffs' arguments. While it is unfortunate that Griffin was at times unable to meet payroll due to Con Ed's tardiness in fulfilling invoices, there is no sound basis on which to infer joint employment from such a situation "where a subcontractor performs merely a majority of its work for a single customer" and sporadically has its invoiced time audited. *Zheng*, 355 F.3d at 75. This Carter factor therefore weighs against Plaintiffs' position.[2]

---

[2] Plaintiffs' remaining argument that the BPA capped flaggers' pay at rates below the prevailing wage rate for safety flaggers and other laborers as set forth in the New York City Comptroller prevailing wage schedules is irrelevant to the analysis as Plaintiffs do not assert prevailing wage rate claims under a joint employer liability theory. *See* Opp. at 21.

### D. Employment Records

"The employment records most relevant to FLSA payment obligations are those concerning hours worked." *Godlewska v. HDA*, 916 F. Supp. 2d 246, 262 (E.D.N.Y. 2013) (quoting *Barfield*, 537 F.3d at 144). Plaintiffs allege Con Ed's retention of flaggers' Sign Off Sheets, Griffin's weekly invoices, and Con Ed's disciplinary complaints regarding individual flaggers constituted retention of Plaintiffs' employment records. As stated previously, both Griffin and Con Ed received flaggers' Sign Off Sheets. Whereas Griffin utilized those sheets to calculate flaggers' hours and pay (while also considering separately flaggers' other work tasks not captured on those sheets including, but not limited to, training and traveling to worksites), Con Ed used the sheets to audit and reconcile Griffin's weekly invoices. Plaintiffs have presented no evidence "suggesting that [Con Ed] maintained the records it held beyond quality control purposes." *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 429 (S.D.N.Y. 2017) (quoting *Hugee v. SJC Grp., Inc.*, 2013 U.S. Dist. LEXIS 116471, at *22 (S.D.N.Y. Aug. 13, 2013)). As such the fourth *Carter* factor is not satisfied.

### E. *Carter* Balancing

The third and fourth *Carter* factors weigh against finding Con Ed jointly employed Plaintiffs. The second and, to a much lesser extent, the first *Carter* factor weigh in Plaintiffs' favor. In balancing these factors, the Court finds that while there is evidence that Con Ed exerted some control over flaggers' work schedules and on a single occasion recommended a flagger be dismissed, the remainder of the evidentiary record establishes that Con Ed did not exert formal control over the flaggers.

### III. Functional Control

Even where an alleged joint employer lacks formal control, we must also consider whether that party exercised functional control over plaintiff workers. The functional control analysis considers:

> (1) whether the putative joint employer's premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the putative joint employer's process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the putative joint employer or its agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the putative joint employer.

*Pierre v. City of N.Y.*, No. 20-cv-5116 (ALC), 2021 U.S. Dist. LEXIS 164946, at *21 (S.D.N.Y. Aug. 31, 2021) (citing *Zheng*, 355 F.3d at 72) (cleaned up). The Court next applies these factors to determine whether Con Ed exercised functional control over Griffin flaggers.

### A. Premises and Equipment

The first *Zheng* factor "is relevant because the shared use of premises and equipment may support the inference that a putative joint employer has functional control over the plaintiffs' work." 355 F.3d at 72. Although shared premises . . . [are not] anything close to a perfect proxy for joint employment (because they are . . . perfectly consistent with a legitimate subcontracting relationship), the factfinder can use these readily verifiable facts as a starting point in uncovering the economic realities. *Id.*

Here, the record is clear that while Plaintiffs conducted their flagging work on "public streets, roadways and sidewalks" adjacent to Con Ed work sites, they were also sometimes sent to Con Ed yards to await assignments. Pls' Counterstatement ¶ 27. Additionally, while Griffin supplied flaggers with equipment, Con Ed provided traffic cones and occasionally provided flaggers with equipment on worksites when needed to prevent a work stoppage. *Id.* at ¶¶ 8, 87.

First, as to premises, while flaggers were confined to work on the public thoroughfares and not on Con Ed's property, this was true only because of the eccentricities of Plaintiffs' work. As flaggers, Plaintiffs were responsible for maintaining safety on roadways adjacent to Con Ed's worksites.  By its very nature, this task could not have been conducted on Defendant's property. Unlike the cases which Defendants cite in support of their position, flaggers were not dispatched to conduct their work on third-party consumers' premises.  *See Hugee*, 2013 U.S. Dist. LEXIS 116471 at *23-24 (finding no shared premises where plaintiff security guard worked at third-party establishments not involved in the action); *Yang v. An Ju Home*, No. 19-CV-5616 (JPO), 2020 U.S. Dist. LEXIS 116319, at *12 (S.D.N.Y. June 29, 2020) (doing the same where plaintiff construction workers worked on projects owned by unaffiliated third parties); *Zavala v. Pei Elec. Servs. Grp. Inc.*, 2022 U.S. Dist. LEXIS 113675, at *27-28 (S.D.N.Y. June 28, 2022) (doing the same where plaintiff electricians were dispatched to the property of unaffiliated third parties). Rather, flaggers were dispatched to Con Ed's own work sites and provided their flagging services in the only area where it was physically possible to do so—the public roadways and sidewalks in the immediate vicinity.  This is sufficient to establish shared premises.

As to equipment, while the "fact that [Con Ed] provided limited pieces of equipment," *Martin*, 273 F. Supp. 3d at 430, would be insufficient alone to satisfy this condition, the evidentiary record contains evidence that flaggers "used Con Edison's" traffic wands at "most times" and would use Con Ed's equipment whenever they "had to go straight to the work site." Pls' Counterstatement at ¶ 87(a).  This is sufficient to establish shared equipment.

### B.  Shifting As A Unit

This factor considers whether Griffin "had a business that *could* or did shift as a unit from one putative joint employer to another."  *Jean-Louis*, 838 F. Supp. 2d at 132 (quoting *Zheng*, 355

F.3d at 72).  This analysis "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client."  *Zheng*, 355 F.3d at 72.  As with shared premises, "the absence of a broad client base is [not] anything close to a perfect proxy for joint employment."  *Id.*

The BPA was not an exclusive arrangement for either party.  Pls' Counterstatement ¶ 20. Con Ed utilized other vendors for flagging services and Griffin provided security services to at least two other entities during the relevant time.  *Id.* at ¶¶ 20-21.  Plaintiff alleges that Griffin's dependence on its contract with Con Ed and inability to bring in any other contracts made it practically dependent on Con Ed.  Opp. at 26-27.  Regardless of their veracity, this evidence is irrelevant to the analysis.  Griffin was clearly not barred from soliciting or taking on work from other contractors as evidenced by the terms of the BPA and its entry into two security service contracts, and, as such, this factor favors Defendants' position.  *See Hugee,* 2013 U.S. Dist. LEXIS 116471, at *25-26 (finding Plaintiff failed to make out this factor where they alleged that "90% of [vendor's] business consisted of subcontracting work for [the alleged joint employer]" where the evidence established the subcontractor was not forced to "only contract with" the alleged joint employer).

### C.  Discreet Line Jobs

The third factor considers "the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer]'s process of production."  *Zheng*, 355 F.3d at 72.  While a jurist interpreting this variable broadly would find it "implicated in *every* subcontracting relationship[] because all subcontractors perform a function that a general contractor deems 'integral' to a product of service," the *Zheng* Court recognized a spectrum between "piecework on a producer's premises that requires minimal training or equipment[] and

which constitutes an essential step in the producer's integrated manufacturing process" and "work that is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology." *Id.* at 73 (emphasis in original). *Id.* at 73. The *Zheng* Court also "believe[d] that both industry custom and historical practice should be consulted" when analyzing this factor. *Id.* Additionally, as recognized in *Jean-Louis*, this factor "appl[ies] with somewhat less vigor where, as here, the parties are engaged in providing services rather than manufacturing a product." 838 F. Supp. 2d at 134.

The record establishes that specialized training is required to become a flagger and that it is not performed on a predictable schedule. Pls' Counterstatement ¶¶ 27, 30 (noting flaggers often waited at Con Ed yards before being dispatched to work site assignments), 81 (noting Griffin provided flaggers with three phases of training which lasted, in total, approximately between 9 and 11 hours and that Con Ed provided on-the-job training as well). But while flagging services might be required for Con Ed to repair and maintain their utility infrastructure, these "services . . . are ultimately just that, services." *Martin*, 273 F. Supp. 3d at 431. "Furthermore, I doubt that providing [flagging] service[s are] actually integral to [Con Ed] Defendants." *Godlewska*, 916 F. Supp. 2d at 264 (citing *Moreau v. Air Fr.*, 356 F.3d 942, 952 (9th Cir. 2003)) (internal quotation marks omitted).[3] Accordingly, the third *Zheng* factor is not satisfied.

---

[3] The Court takes this view without considering or taking judicial notice of the reports Con Ed cited to in support of their argument regarding industry custom. *See* Mot. at 27 n.11. Instead, the Court takes this view for two main reasons. The first is that Con Ed is primarily a utilities company and not a traffic safety organization. The second is that Plaintiffs' argument that flaggers are integral to Con Ed's business because maintenance of the utility grid is essential to Con Ed's business creates too attenuated a link between Plaintiffs' services and Con Ed's business to satisfy this factor.

### D. Contractors' Fungibility

This factor considers "whether responsibility under the contracts could pass from one subcontractor to another without material changes." *Zheng*, 355 F.3d at 72. "[T]his factor weighs in favor of a determination of joint employment when employees are tied to an entity . . . rather than to an ostensible direct employer." *Id.* Conversely, where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity, this factor does not in any way support the determination that a joint employment relationship exists." *Id.*

It is undisputed that Con Ed contracted with multiple vendors to perform flagging work and that Con Ed retained another vendor to provide flaggers after the BPA expired. Pls' Counterstatement at ¶¶ 21, 52-54. Plaintiffs' argument that this factor favors them because three former Griffin flaggers found work with the vendor Con Ed subsequently contracted with after the expiration of the BPA is insufficient to establish lacking fungibility. *See* Opp. at 28-29. Therefore, this factor is not satisfied.

### E. Supervision

This factor considers "the degree to which the [putative joint employer] or [its] agents supervised plaintiffs' work." *Zheng*, 355 F.3d at 72. As set out in the section discussing the second *Carter* factor, this factor is satisfied.

### F. Exclusivity

This factor considers "whether plaintiffs worked exclusively or predominantly for [the putative joint employer.]" *Id.* The *Zheng* Court distinguished between "cases in which the purported joint employees worked exclusively or predominantly for the purported joint employer" and cases "where a subcontractor performs merely a majority of its work for a single

customer." *Id.* at 75. Of the latter, *Zheng* counsels that "there is no sound basis on which to infer that the customer has assumed the prerogatives of an employer." This case falls squarely into the latter category. As stated elsewhere, Griffin was not precluded from providing flagging services to Con Ed and Plaintiffs' repeated references to Griffin's lack of alternative flagging service contracts are insufficient to create a factual question as to this factor. This factor weighs against a finding that Con Ed jointly employed Plaintiffs.

### G. Balancing

A Court can "conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to plaintiffs, defendants are still entitled to judgment as a matter of law." *Zheng*, 355 F.3d at 76. "To reach that conclusion, the Court need not decide that *every* factor weighs against joint employment." *Id.* at 76-77.

Here, two of the *Zheng* factors weigh in Plaintiffs' favor whereas the remaining four factors weigh against a finding of joint employment. As to the first and fifth *Zheng* factors, "the sum of [Plaintiffs'] satisfaction in this case" is that plaintiffs (1) utilized Con Ed's premises and, at times, equipment to perform their work tasks and (2) that Con Ed supervised flaggers on the job along with sporadic supervision from Griffin personnel. *Godlewska v. HAD*, 916 F. Supp. 2d at 265. This alone is insufficient to establish a joint employment relationship.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.

The Clerk of the Court is respectfully directed to terminate the motions docketed at ECF Nos.

685, 719, and 720.

**SO ORDERED.**
**Dated:**    **March 28, 2024**
            **New York, New York**

_____
         **ANDREW L. CARTER, JR.**
         **United States District Judge**